**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNION OF NEEDLETRADES, INDUSTRIAL AND TEXTILE EMPLOYEES AFL-CIO, et al., | : : : | Case No. 2:03-cv-1000 |
| Plaintiffs, | : | Judge Holschuh |
| v. | : | Magistrate Judge Kemp |
| AMERICAN CAPITAL STRATEGIES, LTD., et al., | : : | |
| Defendants. | | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiffs Union of Needletrades, Industrial and Textile Employees AFL-CIO and its Locals 487T and 1925 ("Plaintiffs") bring this action against American Capital Strategies, Ltd. ("ACS") and LaSalle National Bank Association ("LaSalle") (collectively, "Defendants") to remedy an alleged interference with Plaintiffs' contractual relations with Decorative Surfaces International, Inc. ("DSI"). This matter is currently before the Court on Defendants' Motions for Summary Judgment. (R. at 86, 87.) For the following reasons, ACS' Motion (R. at 86) is **GRANTED**, while LaSalle's Motion (R. at 87) is **DENIED**.

**I.     Background**

DSI was created in 1998 when the employees of a prior company, represented by Plaintiffs, negotiated an employee stock ownership plan with ACS and LaSalle and purchased the prior company's Columbus, Ohio manufacturing plant. (ACS Mot. Summ. J. p. 3-4, R. at 86; Pl. Resp. p. 5, R. at 94.) Pursuant to the terms of the collective bargaining agreement ("CBA") negotiated between Plaintiffs and DSI, the employees owned 51% of DSI's shares, while ACS owned the remaining 49%. (Id.) A group of banks including LaSalle, with LaSalle acting as agent, loaned

funds to DSI to facilitate the purchase, and became DSI's senior creditors.  ACS also loaned funds to DSI, and became a subordinated creditor.  (ACS Mot. Summ. J. p. 4, R. at 86.)

By 2000, DSI began to experience severe financial trouble.  DSI could not meet its financial obligations, including its obligations to LaSalle and other creditors, and was losing money.  (Id. p. 5.)  In December 2000 LaSalle, ACS and DSI entered into an amended credit agreement, under which LaSalle established a revolving credit line for DSI, and ACS provided funds for a term loan.  (Id. p. 5-6; Pl. Resp. p. 7, R. at 94.)  Additionally, in November 2000 DSI's Board of Directors began exploring the possibility of selling DSI.  (Pl. Resp. p. 6, R. at 94.)  DSI, however, could not find any buyers at that time.  (ACS Mot. Summ. J. p. 5, R. at 86.)

DSI began defaulting on its new obligations to LaSalle and its other lenders by early 2001.  (LaSalle Mot. Summ. J. p. 4, R. at 87.)  Rather than enforce their collection rights, however, LaSalle and the other lenders entered into a series of forbearance agreements with DSI from February 16, 2001 to April 23, 2001.  (Pl. Resp. p. 8, 15-17, R. at 94.)  Under these forbearance agreements, LaSalle continued to extend DSI a revolving line of credit, while DSI was obligated to regularly report its financial condition to LaSalle.  DSI was also obligated to meet with LaSalle representatives to discuss DSI's business plan and to hire an outside turnaround consultant.  (Id.; LaSalle Mot. Summ. J. p. 4, R. at 87.)

During this time, DSI representatives had also begun negotiating with Omnova Solutions, Inc. ("Omnova") for the purchase of DSI's Columbus plant.  (Pl. Resp. p. 9-12, R. at 94.)  After a series of discussions and DSI Board votes in which ACS became DSI's majority stockholder, DSI and Omnova entered into an asset purchase agreement on April 23, 2001 (the "Omnova sale").  (Id. p. 12.)  Under the terms of the sale, DSI would continue operating for a period of time and DSI's

2

employees would continue to draw pay.  (ACS Mot. Summ. J. p. 7, R. at 86.)  Once DSI agreed to the Omnova sale, however, the shutdown of the Columbus plant was imminent.  DSI notified its employees that the plant would be closed in late July 2001.  (Pl. Resp. p. 17, R. at 94.)

Plaintiffs and DSI began to negotiate the effects of the coming plant closure in April 2001. One of the major points of contention was the issue of the amount of severance pay that DSI's employees would receive.  Plaintiffs demanded 80 hours of pay per year of service for each employee.  (Id. p. 18.)  DSI eventually countered with a proposal for two days of pay per year of service.  (ACS Mot. Summ. J. p. 8, R. at 86.)  Although ACS and LaSalle both knew that DSI and Plaintiffs were negotiating the issue of severance pay (Pl. Resp. p. 18, R. at 94), there is no credible evidence in the record showing that ACS or LaSalle controlled DSI's conduct and decisions during these negotiations.[1]  Although ACS now owned 51% of DSI's shares, ACS did not appoint a majority of DSI's Board of Directors and did not otherwise control DSI's operations.  (ACS Mot. Summ. J. p. 13, R. at 86.)

Plaintiffs and DSI negotiated from April 6, 2001 until May 18, 2001, but could not reach an agreement.  Believing that further negotiations would be fruitless, on June 1, 2001 Plaintiffs sued DSI and requested an injunction to halt the Omnova sale.  (Pl. Resp. p. 23, R. at 94.)  On June 7, 2001 the parties met at the courthouse for the preliminary injunction hearing.  Prior to the hearing, however, Plaintiffs and DSI began negotiating again, and the hearing was delayed.  Gordon O'Brien

_____

[1] Plaintiffs Response and evidentiary submissions contain numerous allegations that Defendants did indeed control DSI's conduct during the course of these negotiations.  However, these allegations are based on hearsay and other inadmissible evidence.  It is well established that "[a] party opposing a motion for summary judgment cannot use hearsay or other inadmissible evidence to create a genuine issue of material fact."  Sperle v. Michigan Dept. of Corrections, 297 F.3d 483, 495 (6th Cir. 2002); see also Wiley v. U.S., 20 F.3d 222, 226 (6th Cir. 1994).

("O'Brien"), an ACS representative and a member of DSI's Board of Directors, was also present to monitor the hearing.  (ACS Mot. Summ. J. p. 8, R. at 86.)  At some point during these negotiations, representatives from Plaintiffs and DSI met in a corridor with O'Brien present, and reached a tentative agreement that would pay the DSI employees 30 hours of pay per year of service.  (Pl. Resp. p. 24, R. at 94.)  While O'Brien was clearly present when these negotiations were taking place and Plaintiffs argue that O'Brien "brokered" the PCA (id. at 24), Jim Cant, DSI's Human Resources Manager and DSI's negotiator, testified that O'Brien did not have much involvement in the courthouse negotiations.  (Jim Cant Dep. p. 59-61, ACS Mot. Summ. J. ex. H, R. at 86.)  LaSalle was not represented at the courthouse negotiations.  Dallas Sells ("Sells"), Plaintiffs' representative, however, stated, under oath, that he saw O'Brien talking on a cell phone to someone Sells believed was a LaSalle representative.  Phone records produced would tend to indicate that O'Brien did not call anyone from LaSalle on June 7, 2001.  (LaSalle Reply p. 2, R. at 100; ACS Reply p. 4 n. 2, R. at 101.)  Sells also stated that "the parties" agreed that the severance pay would be paid out of the proceeds from the Omnova sale. (Pl. Resp. p. 24, R. at 94.)  Sells further stated that O'Brien told him that LaSalle approved the terms of the PCA.  (Pl Resp. p. 24-25, R. at 94.)[2]

Plaintiffs and DSI then entered into a Plant Closing Agreement ("PCA"), which was incorporated into the CBA, on June 15, 2001.  (Id. at 27.)  The only formal parties to the PCA were Plaintiffs and DSI.  Neither ACS nor LaSalle was a formal party to the PCA, but ACS and LaSalle both clearly knew of the existence of the PCA and the severance pay provisions.  O'Brien's representation that LaSalle approved the terms of the PCA was also not incorporated into the PCA

---

[2] While this statement would certainly corroborate Sells' testimony, it appears to be inadmissible hearsay and the Court therefore does not rely on it or give it any weight when ruling on Defendants' Motions.

that the DSI employees approved.  The PCA also did not contain any provision concerning funding the severance pay with the proceeds from the Omnova sale.  (ACS Mot. Summ. J. p. 9, R. at 86; LaSalle Mot. Summ. J. p. 5, R. at 87.)  The terms of the PCA required DSI to pay severance pay to its employees on July 24, 2001 (ACS Mot. Summ. J. p. 12, R. at 86), and also required Plaintiffs to dismiss with prejudice their claims against DSI arising out of the Omnova sale.  (Pl. Resp. p. 28-29, R. at 94.)

After executing the PCA, DSI continued to submit financial information to LaSalle, including budget forecasts.  These forecasts included the approximately $1.5 million in severance pay that DSI anticipated paying to its employees.  (Id. p. 29.)  On July 13, 2001, however, LaSalle sent a letter to O'Brien, the DSI Director who, according to Sells, talked to LaSalle before DSI agreed to the PCA.  That letter objected to the severance pay package, on the ground that DSI did not have enough credit available under the forbearance agreements and revolving credit agreement for a loan of that size.  (LaSalle Mot. Summ. J. p. 6, R. at 87.)  LaSalle informed DSI that, unless it obtained funding from ACS or another third party, DSI would not have sufficient funds to pay the severance pay.  (Id.)  Nevertheless, DSI, as previously known to the Defendants, closed its Columbus plant on July 22, and on July 23, 2001 DSI requested approximately $1.5 million from LaSalle to fund the severance package that would be paid the next day.  (Pl. Resp. p. 33, R. at 94.) LaSalle denied the request, and the next day the severance pay was not distributed to DSI's employees.  (Id. p. 34.)  No one from ACS or LaSalle explicitly directed DSI not to make the severance payment.  (ACS Reply p. 5, R. at 101; LaSalle Mot. Summ. J. p. 6, R. at 87.)  DSI's CEO, Robert Sharp, stated that the severance pay was not distributed because DSI did not have sufficient funds to pay it, and Noel Beasley, Plaintiffs' International Vice President and a DSI Boardmember,

agreed.  (ACS Mot. Summ. J. p. 16-17, R. at 86.)  Plaintiffs filed a grievance against DSI on August 8, 2001 that was submitted to arbitration.  (Id. p. 35.)

The arbitration hearing was held on September 12, 2002.  Plaintiffs were the only parties present at this arbitration.  Although DSI had notice of the arbitration (Pl. Resp. p. 35, R. at 94), DSI, which by that time was in the middle of bankruptcy, did not appear and did not participate in the arbitration in any way.  (Id. p. 8. )  Neither ACS nor LaSalle was subpoenaed, Plaintiffs did not advance any claims against them at this hearing, and they did not appear at the arbitration.  (Id.; ACS Mot. Summ. J. p. 10, R. at 86.)  The arbitrator issued a decision on October 30, 2002, finding that DSI breached the PCA and ordering DSI to pay the severance pay.  The arbitrator's decision did not reference ACS or LaSalle.  (Id.)

Plaintiffs filed their Complaint in this case on October 30, 2003.  (R. at 1.)  After LaSalle filed a Motion to Dismiss on December 30, 2003 (R. at 3), Plaintiffs filed an Amended Complaint on February 6, 2004.  (R. at 8.)  This Amended Complaint alleged that Defendants were liable under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (2006) to Plaintiffs for failure to pay the severance pay (Am. Compl. ¶¶ 28, 29, R. at 8), and also brought a state law claim alleging that Defendants interfered with Plaintiffs' contractual relations.  (Id. ¶¶ 30, 31.)  ACS filed its own Motion to Dismiss on April 5, 2004 (R. at 19), and on April 29, 2004 Plaintiffs filed a Motion for Leave to File a Second Amended Complaint.  (R. at 23.)

On February 22, 2005[3] this Court granted in part and denied in part Defendants' respective Motions to Dismiss, and granted in part and denied in part Plaintiffs' Motion (the "Memorandum").

---

[3] This Memorandum and Order was signed on February 18, 2005, but was not docketed until February 22, 2005.  For clarity's sake, the Court will refer to the February 22, 2005 date.

(Memorandum and Order, R. at 42.)  In the Memorandum, the Court found that Plaintiff's § 301 claim was barred as untimely, which made Plaintiffs' attempt to amend their Complaint as to this claim futile.  (Id. p. 7.)  The Court thus granted Defendants' Motions as to Plaintiffs' § 301 claim. (Id. p. 11-12.)  The Court, however, granted Plaintiffs leave to amend their complaint as to the intentional interference with a contract claim.  (Id.)  While the Court noted that this claim was arguably preempted by § 301 and thus untimely as well, the Court found that before it could resolve the preemption issue, the Court had to determine "whether Defendants were in fact in privity with DSI."  If so, Defendants would be bound by the arbitrator's finding that DSI breached the PCA - incorporated in the CBA - and there would be no reason to interpret the CBA and, hence, no preemption.  The Court noted that resolution of these issues would require further discovery and, most likely, motion practice, and thus denied the Motions to Dismiss as to Plaintiffs' state law claim. (Id. p. 10.)  Plaintiffs filed their Second Amended Complaint on February 28, 2005, bringing one claim against Defendants for intentional interference with a contract.  (¶¶ 28, 29, R. at 43.)

After engaging in further discovery, both ACS and LaSalle filed Motions for Summary Judgment on June 6, 2007.  (R. at 86, 87.)  Defendants argue that Plaintiffs' interference with a contract claim is preempted by § 301 because they were not in privity with DSI at the arbitration and thus cannot be bound by that judgment.  Defendants also argue for summary judgment on the merits of Plaintiffs' claim.  Plaintiffs filed a joint response on July 27, 2007 (R. at 94), and Defendants replied on September 10, 2007.  (R. at 100, 101.)  These issues are now ripe for adjudication.

## II.     Defendants' Motions for Summary Judgment

### A.        General Standard for Granting Summary Judgment

Although summary judgment should be cautiously invoked, it is an integral part of the

Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).  The standard for summary judgment is found in Federal Rule of Civil Procedure 56(c):

> [Summary judgment] . . . should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

FED. R. CIV. P. 56(c).  Summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is . . . [and where] no genuine issue remains for trial, . . . [for] the purpose of the rule is not to cut litigants off from their right to trial by jury if they really have issues to try." Poller v. Columbia Broadcasting Sys., 368 U.S. 464, 467 (1962) (quoting Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627 (1944)).  See also Lansing Dairy, Inc. v. Espy, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried.  Lashlee v. Sumner,  570 F.2d 107, 111 (6th Cir. 1978). The court's duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Weaver v. Shadoan, 340 F.3d 398, 405 (6th Cir. 2003).

In a motion for summary judgment, the moving party bears the initial burden of showing that no genuine issue as to any material fact exists and that it is entitled to a judgment as a matter of law. Leary v. Daeschner, 349 F.3d 888, 897 (6th Cir. 2003).  All the evidence and facts, as well as inferences to be drawn from the underlying facts, must be considered in the light most favorable to the party opposing the motion.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

8

587-88 (1986);  Wade v. Knoxville Util. Bd., 259 F.3d 452, 460 (6th Cir. 2001).  Additionally, any "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157-60 (1970).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson, 477 U.S. at 247-48 (emphasis in original).  A "material" fact is one that "would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of [an] appropriate principle of law to the rights and obligations of the parties."  Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984).  See also Anderson, 477 U.S. at 248.  An issue of material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  See also Leary, 349 F.3d at 897.

If the moving party meets its burden, and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  Celotex, 477 U.S. at 322.  The nonmoving party must demonstrate that "there is a genuine issue for trial," and  "cannot rest on her pleadings."  Hall v. Tollett, 128 F.3d 418, 422 (6th Cir. 1997).

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial.  If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

FED. R. CIV. P. 56(e).

The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. Anderson, 477 U.S. at 252. The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Phillip Morris Companies, Inc., 8 F.3d 335, 340 (6th Cir. 1993). The court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence. Anderson, 477 U.S. at 251-52; Lansing Dairy, Inc., 39 F.3d at 1347.

### B. Section 301 Preemption

Defendants first argue that they are entitled to summary judgment because Plaintiffs' state law claim is preempted by § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. Defendants argue that the arbitrator's award cannot preclude them from litigating the issue of the breach of the PCA because they were not in privity with DSI as to the arbitrator's decision. Plaintiffs have countered by arguing that finding privity and issue preclusion are not necessary because their claim is not preempted.

### 1. Applicable Law

### a. Section 301

Section 301(a) provides that

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

10

The Supreme Court has long recognized the "unusually powerful" preemptive force of § 301, which completely displaces any state law cause of action involving contracts between employers and labor organizations.  See, e.g., Franchise Tax Bd of Cal. v. Construction Laborers Vacation Trust for Southern Cal., 463 U.S. 1 (1983); Avco Corp. v. Machinists, 390 U.S. 557 (1968).  This preemptive power is based on the particular need for uniform, national law to prevail over inconsistent local rules in the area of labor policy.  Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 404 n. 3 (1988); DeCoe v. General Motors Corp., 32 F.3d 212, 216 (6th Cir. 1994).  Section 301 preemption is designed to further the principle that, when "resolution of a state law claim depends upon the meaning of a collective-bargaining agreement . . . federal labor-law principles - necessarily uniform throughout the Nation - must be employed to resolve the dispute."  Lingle, 486 U.S. at 406. Consequently, state law claims that only tangentially involve a collective bargaining agreement, or that are independent of the collective bargaining agreement, do not warrant § 301 preemption.  See Livadas v. Bradshaw, 512 U.S. 107, 123-124 (1994).

The Sixth Circuit has developed a two part test to determine whether § 301 preempts a state law claim.  "First, [a] district court must examine whether proof of the state law claim requires interpretation of collective bargaining agreement terms.  . . .  If the plaintiff can prove all of the elements of his claim without the necessity of contract interpretation, then his claim is independent of the labor agreement."  DeCoe, 32 F.3d at 216.  With regard to intentional interference with a contract claims, the Sixth Circuit has "made clear that [these claims] are preempted if, but only if, breach of contract is an essential element of such a state law claim."  Fox v. Parker Hannifin Corp., 914 F.2d 795, 800 (6th Cir. 1990) (internal quotation omitted).  After DeCoe and Fox were decided, the Ohio Supreme Court held that "in order to recover for a claim of intentional interference with

11

a contract, one must prove . . . the wrongdoer's intentional procurement of the contract's breach .

. . ." <u>Kenty v. Transamerica Premium Ins. Co.</u>, 72 Ohio St. 3d 415, 419, 650 N.E.2d 863 (1995).

"Second, the court must ascertain whether the right claimed by the plaintiff is created by the

collective bargaining agreement or by state law." <u>DeCoe</u>, 32 F.3d at 216.

> "[P]reemption is required when 'resolution of [the plaintiff's] claim will not involve
> the direct interpretation of a precise term of the [collective bargaining agreement],
> but . . . will require a court to address relationships that have been created through
> the collective bargaining process and to mediate a dispute founded upon rights
> created by a [collective bargaining agreement].'"

<u>Id.</u> at 218 (<u>quoting</u> <u>Jones v. General Motors Corp.</u>, 939 F.2d 380 (6th Cir. 1991). If a plaintiff's

claim both (1) does not depend upon interpreting a provision of the collective bargaining agreement;

and (2) is created by state law; then there is no § 301 preemption. "However, if neither or only one

criterion is satisfied, [§] 301 preemption is warranted." <u>Id.</u>

### b. Issue Preclusion and Privity

Under federal law,[4] issue preclusion "means simply that when an issue of ultimate fact has

once been determined by a valid and final judgment, that issue cannot again be litigated between the

same parties in any future lawsuit." <u>Ashe v. Swenson</u>, 397 U.S. 436, 443 (1970). Issue preclusion

applies when:

> (1)      the issue in the subsequent litigation is identical to that resolved in the earlier

---

[4] LaSalle raises the issue of whether federal or Ohio law governing privity and issue preclusion applies in this case, because "[t]he source of law that governs the preclusive effect of an arbitration award is not well developed." (LaSalle Mot. Summ. J. p. 12, R. at 87.) The arbitrator's decision does not identify what law the arbitrator applied when deciding that DSI breached the PCA, but the powerful preemptive effect of § 301 means that the arbitrator was necessarily applying federal law when determining this issue. This mitigates in favor of applying federal preclusive principles. This issue, however, is not particularly determinative and the Court will not attempt to conclusively resolve it, because as explained below the Court will dispose of Defendants' Motions on the merits.

litigation,

(2)     the issue was actually litigated and decided in the prior action,

(3)     the resolution of the issue was necessary and essential to a judgment on the merits in the prior litigation,

(4)     the party to be [precluded] was a party to the prior litigation (or in privity with such a party), and

(5)     the party to be [precluded] had a full and fair opportunity to litigate the issue.

Wolfe v. Perry, 412 F.3d 707, 716 (6th Cir. 2005).  "Privity is limited to "a successor in interest to the party, one who controlled the earlier action, or one whose interests were adequately represented."  U.S. v. Vasilakos, 508 F.3d 401, 406 (6th Cir. 2007) (quoting Sanders Confectionary Products, Inc. v. Heller Financial, Inc., 973 F.2d 474, 481 (6th Cir. 1992)).

### 2.     Analysis

#### a.     Defendants' Initial Burden

Both ACS and LaSalle argue that, under DeCoe, Plaintiffs' intentional interference with a contract claim is preempted by § 301, but offer different reasons.  (ACS Mot. Summ. J. p. 11-13, R. at 86; LaSalle Mot. Summ. J. p. 9-16, R. at 87.)  ACS argues that Plaintiffs' claim is preempted because, to determine if there was a breach of the PCA, the Court would have to interpret numerous terms of the PCA.  (ACS Mot. Summ. J. p. 12, R. at 86.)  ACS argues that preconditions to payment existed in the PCA and that the arbitrator did not determine whether these preconditions had been met.  Therefore, ACS argues, to interpret whether the PCA was in fact breached, the Court would necessarily have to interpret these terms regardless of the arbitrator's decision.  Additionally, ACS argues that even the privity determination implicates an essential term of the PCA, namely, who the parties to the PCA were.  In ACS's view, "this cuts at the core of the collective bargaining

relationship" because it implicates the relationships created by the PCA, and thus means that Plaintiffs' claims are preempted by § 301.  (Id.)  ACS further argues that, even if the Court were to examine whether or not ACS was in privity with DSI, the evidence shows that it was not.  ACS points to deposition testimony from DSI's CEO, Robert Sharp, who testified that ACS had no input or control over DSI's financial or operational decisions.  (Id. p. 13.)  One of DSI's Boardmembers and an ACS employee, Gordon O'Brien, has also submitted an affidavit in which he states that ACS was not controlling DSI.  (Id.)

LaSalle argues that Plaintiffs' claim is preempted because breach of the PCA is an essential element of Plaintiffs' claim, and LaSalle was not in privity with DSI and cannot be bound by the arbitrator's decision concerning that issue.  (LaSalle Mot. Summ. J. p. 12, R. at 87.)  LaSalle points out that there have been no allegations that it is a successor in interest to DSI (id. p. 13-14), and that LaSalle's vice president has submitted an affidavit stating that LaSalle did not direct DSI's actions. (Decl. of Andrew Heinz ¶¶ 5, 9, LaSalle Mot. Summ. J. ex. 3, R. at 87.)  LaSalle further argues that, even if there is a genuine issue as to whether LaSalle was in privity with DSI, it cannot be precluded from litigating the issue of the PCA's breach because this issue was not actually litigated at the arbitration hearing.  (Id. p. 14-15.)  LaSalle points out that two of the elements for applying issue preclusion are that the issue must have been actually litigated in the prior proceeding, and that the party to be precluded must have had a full and fair opportunity to litigate that issue.  See Wolfe, 412 F.3d at 716.  LaSalle argues that, because neither DSI nor LaSalle appeared at the arbitration hearing and contested the issue of the PCA's breach, this issue was not actually litigated.  Additionally, LaSalle argues that it did not have a full and fair opportunity to litigate this issue, because it was not present and was not represented at the arbitration hearing.  (LaSalle Mot. Summ. J. p. 16, R. at 87.)

These arguments are sufficient to sustain Defendants' initial summary judgment burden of pointing out that no genuine issues of material fact exist, that the arbitration decision should not be given preclusive effect, and that Plaintiffs' claim is preempted.  The burden now shifts to Plaintiffs to rebut Defendants' showing.

### b.        Plaintiffs' Burden in Response

Plaintiffs have elected not to respond to Defendants' arguments concerning the lack of privity between Defendants and DSI.  Plaintiffs instead argue that they do not need to establish privity between Defendants and DSI, because their claim passes both parts of DeCoe's preemption test.  (Pl. Resp. p. 36-46, R. at 94.)

Plaintiffs mainly rely on Dougherty v. Parsec, Inc. et al., 872 F.2d 766 (6th Cir. 1989) for their argument that the Court does not need to interpret the terms of the PCA to resolve Plaintiffs' state law claim.  (Pl. Resp. p. 39-44, R. at 94.)  Dougherty, in pertinent part, involved an action by a plaintiff-employee against his defendant-employer and a defendant-third party, alleging that under Ohio law the defendant-third party intentionally interfered with the plaintiff-employee's contractual relationship with his defendant-employer.  Dougherty, 872 F.2d at 767.  The Sixth Circuit initially held that the plaintiff-employee's claim was preempted by § 301, see Dougherty v. Parsec, Inc., 824 F.2d 1477 (6th Cir. 1987), but on remand from the Supreme Court for reconsideration in light of Lingle, 486 U.S. at 399, the Sixth Circuit held that the plaintiff-employee's intentional interference with a contract claim was not preempted.  Dougherty, 872 F.2d at 771.  The Dougherty court noted that, in 1989, "The Ohio law on the tort of [intentional] interference with [a] contract [was] not clear."  Id. at 770.  The Dougherty court surveyed the state of the then-existing law and determined that the elements of a claim for intentional interference with a contract in Ohio did not include

15

proving a breach of the contract.  Id.  Thus, because the state law claim did not require the court to interpret the terms of a collective bargaining agreement, the Dougherty court held that § 301 did not preempt the claim.  Id. at 770-771.  Plaintiffs argue that Dougherty means their claim is not preempted.

Plaintiffs also rely on footnote 4 in Dougherty, in which the Sixth Circuit engaged in an alternative analysis of the § 301 preemption argument, as support for their argument that their claim is not preempted.  (Pl. Resp. p. 43-44, R. at 94.)  In that footnote the Sixth Circuit noted that even if a state law claim required a plaintiff to prove a breach of contract, Lingle suggested that § 301 still may not preempt the state law claim because the claim could be resolved without reference to the terms of the collective bargaining agreement.  Dougherty, 872 F.2d at 770 n. 4.  Lingle involved interpretation of an Illinois cause of action for retaliatory discharge that required a plaintiff to show that he or she was discharged or threatened with discharge, and that the plaintiff's employer was motivated by a desire to deter the plaintiff from exercising his or her rights.  Lingle, 486 U.S. at 407. The Supreme Court held that the state law cause of action was not preempted by § 301 because "[e]ach of these purely factual questions pertains to the conduct of the employee and the conduct and motivation of the employer.  Neither of the elements requires a court to interpret any term of a collective-bargaining agreement."  Id.  The Dougherty court reasoned that if the state law cause of action in Lingle was not preempted, an Ohio cause of action that included proving breach of contract as an element should not be preempted either by analogizing the "discharged or threatened with discharge" element to the "intentional procurement of breach" element.  Dougherty, 872 F.2d at 770 n. 4.

The Sixth Circuit has not overruled Dougherty.  More recent developments in Sixth Circuit

and Ohio law regarding § 301 preemption and intentional interference with a contract claims, however, create confusion regarding <u>Dougherty</u>'s impact on this case.  As the Ohio Supreme Court announced in <u>Kenty</u>, breach of contract is now an essential element of the tort of intentional interference with a contract under Ohio law.  See <u>Kenty</u>, 72 Ohio St. 3d at 419.  <u>Dougherty</u>'s analysis was based on the proposition that breach of contract was not an element of such a claim.  The Sixth Circuit has also articulated a new test regarding § 301 preemption in <u>DeCoe</u>, which discusses not only the question addressed in <u>Dougherty</u> regarding interpretation of a collective bargaining agreement, but also discusses the source of the rights a plaintiff claims.  The tension between <u>Dougherty</u>, <u>Kenty</u>, and <u>DeCoe</u> makes a clean resolution of the § 301 preemption issue difficult.  While <u>Kenty</u>'s definitive holding that breach of contract is an element of a *prima facie* Ohio claim for intentional interference with a contract, and <u>Fox</u>'s statement that preemption is warranted if "breach of contract is an essential element of [] a state law claim," <u>Fox</u>, 914 F.2d at 800, would appear to undermine <u>Dougherty</u>'s main holding, footnote 4 from <u>Dougherty</u> addressed the situation in which breach of contract is an element of the state law claim and still declined to find preemption.

Furthermore, the specific facts of this case may render interpretation of the PCA unnecessary.  Plaintiff states that DSI had conceded its obligation to pay the severance pay to its employees, and that the only reason the payments were not made was because no funds were available.  (Pl. Resp. p. 37, 45, R. at 94.)  Plaintiff argues that because the right to severance pay is not disputed, interpreting the PCA's terms regarding the severance pay is unnecessary.  Although Defendants argue that "neither LaSalle nor ACS have admitted, stipulated, or otherwise 'agreed' that DSI 'owed the severance pay' or that there was a breach of the PCA," (LaSalle Reply p. 5, R. at

100), they have also not denied it.  Nor have they defended on this ground.  The breach is not contested by anyone; it is an undisputed fact; and it therefore would appear that Plaintiffs clearly can prove a breach of the PCA without resorting to interpreting the PCA's terms.  It would appear that Plaintiffs could prove a breach of the PCA without resorting to interpreting the PCA's terms.  The fact that Plaintiffs would  need to reference the PCA, "'not every dispute . . . tangentially involving a provision of a collective bargaining agreement[] is preempted by § 301.'" Lingle, 486 U.S. at 413 (quoting Allis-Chalmers v. Lueck, 471 U.S. 202, 211 (1985)).

Dougherty also said nothing about the source of the plaintiff's claimed right.  Plaintiffs in this case argue that their claims are for intentional interference with a contract, and that the right they seek to vindicate is a creature of state law, not the PCA.  (Pl. Resp. p. 39, R. at 94.)  Under the second part of the DeCoe preemption test, the plaintiff must show that the right he or she claims is created by state law, not the collective bargaining agreement.  DeCoe, 32 F.3d at 216.  The plaintiff in DeCoe was a union committee man at a General Motors plant, responsible for, *inter alia*, processing grievances, who sued under a Michigan cause of action for tortious interference with a business relationship.  Id. at 214-15.  The plaintiff alleged that various employees filed false sexual harassment charges against him in an effort to deprive him of his committee man position and to interfere with his responsibilities as a committee man and his relationship with his employer.  The Sixth Circuit held that § 301 preempted the state law claim because, even though the Michigan cause of action did not require the plaintiff to prove a breach of the underlying contract, id. at 218, under the second prong of the DeCoe preemption analysis, "the business relationship the plaintiff claim[ed] was damaged was created entirely by the [collective bargaining agreement]. . . .  The [collective bargaining agreement] established the rights and responsibilities" of committee men that

were at issue.  Id.

The second prong of the DeCoe preemption test may arguably appear to preempt Plaintiffs claim.  The right that Plaintiffs claim Defendants interfered with would appear to be the right of their members to severance pay, which was created by the PCA.  Plaintiffs argue, however, that the right they are actually claiming is the state law right to engage in contractual relations without interference, which would avoid the second prong of DeCoe's preemption test.

DeCoe is factually distinguishable.  The interfering parties in that case were employees who were subject to the same collective bargaining agreement that governed the plaintiff's responsibilities, and the interfering parties used company grievance procedures created by the collective bargaining agreement to interfere with the plaintiff's responsibilities.  In the present case, ACS and LaSalle were outside parties whose rights and responsibilities were not created by the PCA, and who did not stand in the same relationship to Plaintiffs and DSI that the defendants in DeCoe did with the plaintiff and General Motors.  The relationship between Plaintiffs and Defendants in this case was not created by the collective bargaining process, unlike the relationship between the committee man plaintiff and the employee defendants in DeCoe.

The DeCoe court made the general statement that, if a plaintiff's claim is created by a collective bargaining agreement and not solely by state law, the claim would be preempted.  This statement, however, must be considered in the context of what else the Sixth Circuit said in this regard.  The DeCoe court said that preemption is required when resolution of a plaintiff's claim will require a court "to address relationships that have been created through the collective bargaining process *and to mediate a dispute founded upon rights created by a [collective bargaining agreement.]*" DeCoe, 32 F.3d at 218 (emphasis added).  In the present case, there is no dispute to

19

be mediated by the Court.  Under the unique facts of this case, it is undispted that the PCA required

DSI to pay severance pay to its employees, and it is undisputed that DSI breached its agreement

when it did not do so.  Any reference to the PCA to determine the amount due as damages would

be a tangential reference not requiring preemption.

The preemptive power of § 301 is based on the principle that when "resolution of a state law

claim depends on the meaning of a collective bargaining agreement . . . federal labor-law principles -

necessarily uniform throughout the Nation - must be employed *to resolve the dispute*."  <u>Lingle</u>, 486

U.S. at 406 (emphasis added).  When - as in the present case - there is no dispute regarding the

meaning of the PCA, and the disputed facts involve the conduct of parties outside the PCA, i.e. ACS

and LaSalle, the need for preemption to preserve national uniformity of decisions involving

collective bargaining agreements is not present.

Until the Sixth Circuit clarifies <u>Dougherty</u>'s continued viability in light of <u>Kenty</u> and <u>DeCoe</u>,

the state of the law with regards to § 301 preemption of Ohio intentional interference with a contract

claims will remain unclear.  However, under the specific facts of this case, the Court concludes that

Plaintiffs' claim is not preempted.  Because DSI's obligation to pay the severance pay under the

PCA and DSI's breach of that obligation are not disputed, there is only, at most, a tangential

relationship between Plaintiffs' claim and the PCA's terms.  The Court does not need to interpret

those terms in order to rule on the merits of Plaintiffs' state law claim.  There is no § 301 preemption

in this specific case, and the Court proceeds to consider the merits of Plaintiffs' state law claim.

### C.    Intentional Interference with a Contract

Defendants both argue that Plaintiffs have not presented any evidence of intentional

interference with Plaintiffs' contract with DSI.  Defendants also argue that any actions they may

have taken to interfere with the PCA were justified or privileged, which would excuse them from liability.  Plaintiffs counter by arguing that the evidence in the record shows that both ACS and LaSalle did intentionally cause DSI to breach the PCA, and that Defendants' actions were not justified because they were wrongful.

### 1.  Applicable Law

The Ohio Supreme Court first recognized a cause of action for intentional interference with a contract in <u>Kenty</u>.  Adopting § 766 of the Restatement (2d) of Torts, the Ohio Supreme Court stated that "in order to recover for a claim of intentional interference with a contract, one must prove (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages."  <u>Kenty</u>, 72 Ohio St. 3d at 419.  Persons subject to liability are those "who intentionally and improperly interfere[] with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract."  <u>Id.</u> (<u>quoting</u> 4 RESTATEMENT (SECOND) OF TORTS § 766 (1979.)

Only the third and fourth elements are at issue in this case, and they are substantially related.  "Intentional procurement" refers to conduct that causes the third party to breach the contract, or that leaves the third party with no choice but to breach the contract.  RESTATEMENT § 766 cmt. h.  "Intentional" means that the actor must desire to cause a breach of contract, or know that breach of contract is substantially certain to result from the interference.  <u>Id.</u> cmt. j.  However, even if the plaintiff can show intentional procurement, "Only improper interference with a contract is actionable. . . . [E]ven if an actor's interference with another's contract causes damages to be suffered, that interference does not constitute a tort if the interference is justified."  <u>Fred Siegel Co.,</u>

L.P.A. v. Arter & Hadden, 85 Ohio St. 3d 171, 176, 707 N.E.2d 853 (1999).  "The issue in each case is whether the interference is improper or not under the circumstances . . . ."  4 RESTATEMENT (SECOND) OF TORTS § 767 cmt. b (1979).  The Fred Siegel court adopted a balancing test set forth in § 767 of the Restatement, and held that

> Accordingly, in determining whether an actor has acted improperly in intentionally interfering with a contract . . . consideration should be given to the following factors: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

Fred Siegel, 85 Ohio St. 3d at 178-79 (citing RESTATEMENT (SECOND) OF TORTS § 767).  The nature of the actor's conduct is the chief factor, RESTATEMENT § 767 cmt. c, but the test is a balancing test.

Courts have generally held that interference is justified or is not improper if the interfering party is legitimately asserting a legally protected interest that the interfering party believes will be damaged or impaired by the performance of the contract.  See, e.g., Patterson v. Warren, 201 F.3d 441 (Table), 1999 WL 1253086, *3 (6th Cir. Dec. 17, 1999); Emergency Preemption, Inc. v. Emergency Preemption Systems, Inc., No. 71350, 1997 WL 473093, *5 (Ohio App. 8th Dist. Aug 14, 1997); 4 RESTATEMENT (SECOND) OF TORTS § 773 (1979).  Creditors of a corporation generally are justified in interfering with a corporation's contracts in furtherance of the creditor's legitimate business interests, so long as the interference is not done through improper means.  See Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 601(6th Cir. 1988); Aetna Cas. and Sur. Co. v. Leahey Constr. Co., Inc., 22 F.Supp.2d 695, 705 (N.D. Ohio 1998); c.f. 4 RESTATEMENT (SECOND) OF TORTS § 769, cmt. b (1979) (stating this principle for the tort of intentional interference with a prospective contract and stating that, while it does not explicitly apply to the tort of inducing

22

breach of an existing contract, "[t]his does not imply . . . that the actor's interference is necessarily improper in such a case under the general principle stated in § 767").

### 2.    Analysis

#### a.    Defendants' Initial Burden

ACS presents the deposition testimony of DSI's Human Resources Manager Jim Cant and DSI's CEO Robert Sharp, both of whom testified that ACS did not direct DSI to not make the severance pay.  (ACS Mot. Summ. J. p. 14-16, R. at 86.)  Rather, both stated that the reason the severance pay was not distributed was that DSI did not have sufficient funds to pay it.  (Id.) Furthermore, both Cant and O'Brien, the ACS representative at the courthouse while the PCA was being negotiated, stated that ACS was not a party to the PCA and did not review DSI's proposals to Plaintiffs during the PCA negotiations.  (ACS Mot. Summ. J. ex. E, H, R. at 86.)  Plaintiffs' International Vice President Noel Beasley agreed generally that the reason the severance  pay was not distributed was because DSI did not have sufficient funds, and acknowledged that he had no personal knowledge of ACS directing DSI to not make the payment.  (Id. at 17.)  Furthermore, the President of Plaintiffs' local union, Roosevelt Coffey, when asked what facts he had to support a conclusion that ACS prevented DSI from making the severance payment, responded by stating "I have no facts."  (Id.)  ACS also argues that, as a shareholder and creditor with a stake of several million dollars in DSI, it was privileged to protect its own business interests by not advancing funds to DSI to cover the severance pay.

LaSalle notes that discovery has adduced no evidence to support Plaintiffs' earlier claims that LaSalle "directed" DSI not to pay the severance pay, and that the only action on LaSalle's part that Plaintiffs can point to is LaSalle's refusal on July 23, 2001 to advance sufficient funds to cover

the severance pay.  LaSalle points out that it had no contractual obligation to DSI to fund the severance pay, which was significantly greater than DSI's available credit under the revolving loan established between LaSalle and DSI.  (LaSalle Mot. Summ. J. p. 17, R. at 87.)  LaSalle notes that it notified Plaintiffs that it would not fund the severance pay in a letter sent to one of DSI's Directors on July13, 2001, and that it did not interfere with DSI's ability to seek funding from other sources. LaSalle also argues that even if its refusal to advance funds to cover the severance pay could be considered interference, such interference was justified because LaSalle, as DSI's senior creditor, was acting to protect its legitimate business interests in DSI.  (Id. at 19.)

These arguments are sufficient to satisfy Defendants' initial burden to demonstrate that there is no genuine issue of material fact as to Plaintiffs' claim.  The burden is now on Plaintiffs to bring forth "specific facts showing a genuine issue for trial."  FED. R. CIV. P. 56(e).

### b.     Plaintiffs' Burden in Response

Plaintiffs' arguments with regards to both ACS and LaSalle are as follows.  (Pl. Resp. p. 49-50, R. at 94.)  Both ACS and LaSalle knew that Plaintiffs and DSI were negotiating the issue of severance pay.  ACS, through O'Brien's involvement in the negotiations, "brokered" or otherwise agreed to the PCA's terms.  LaSalle also agreed to the PCA, as O'Brien reported to Plaintiffs.  This agreement included the understanding that the severance pay would be funded by the proceeds from the Omnova sale.  DSI submitted budget forecasts to LaSalle that included $1.5 million for the severance pay, and LaSalle never told DSI that it would not fund the severance pay and did not otherwise object to it.  LaSalle did, however, tell ACS, through O'Brien, that it had decided not to fund the severance pay.  Once ACS knew LaSalle would not fund the severance pay, it was on notice that it was "up to ACS" to fund the severance pay.  ACS, however, decided not to fund the

24

severance pay at a July 20, 2001 meeting between ACS and DSI representatives. When Plaintiffs requested funding for the severance pay from LaSalle, LaSalle refused. Plaintiffs argue that ACS' and LaSalle's actions "prevented DSI's performance of the plant closing agreement by depriving DSI of the means of performance thereby intentionally interfering with the plant closing agreement." (Id.) Plaintiffs also argue that ACS' and LaSalle's conduct was not justified because they used improper means, namely, first agreeing to fund the severance pay with the Omnova sale proceeds and then breaking that promise. (Id. at p. 55-56.)

### i.     ACS

The evidence that Plaintiffs have presented to support their arguments, however, is insufficient to allow their claims to survive ACS' Motion. Plaintiffs have not identified any actual conduct on ACS' part that induced or otherwise caused DSI to breach the PCA. Plaintiffs rely on a July 20, 2001 meeting where ACS allegedly decided not to fund the severance payments. But the evidence Plaintiffs purport to rely on for this assertion does not support Plaintiffs' position. Plaintiffs cite to notes taken by David Mesick, an outside financial consultant hired by DSI at LaSalle's direction and a participant in this meeting, and state that these notes indicate that the purpose of the meeting was to "'decide and determine' whether to fund the severance." (Id. at 49-50.) Plaintiffs point the Court to exhibit 42 to Mesick's deposition. (Id. p. 32.) Plaintiffs, however, have not filed with the Court exhibit 42 to Mesick's deposition. Plaintiffs' list of exhibits to Mesick's deposition ends with exhibit 29. (See id. ex. 7, R. at 94-27, 94-28, 94-29.) Furthermore, ACS points out that, in his deposition, Mesick testified that the purpose of the meeting was to determine *how* to fund the severance pay, not *whether* to fund it. (Dep. David Mesick p. 205-206, ACS Mot. Summ. J. ex. I, R. at 86.) Plaintiffs have not produced any evidence to support their

25

assertion that ACS decided not to fund the severance pay at the July 20, 2001 meeting.

Plaintiffs further argue that, once ACS learned that LaSalle would not fund the severance pay, it was "up to ACS" to fund it itself. There is no evidence, however, that DSI actually asked for funding for the severance pay from ACS after learning that LaSalle would not fund it. Whatever involvement ACS may have had in the negotiations leading up to signing the PCA, Plaintiffs have not presented evidence sufficient to create a genuine issue as to the fact that ACS took no affirmative action that interfered with or in any way prevented DSI from performing its obligations under the PCA. ACS had no obligation to simply volunteer funding to DSI once it learned that LaSalle would not fund the severance pay. Plaintiff's speculation as to what ACS should have done when it learned that LaSalle would not fund the severance pay is insufficient to create a genuine issue of material fact. Because Plaintiffs cannot identify any conduct on ACS' part that procured DSI's breach of the PCA, it is unnecessary to discuss the justification element, and summary judgment is appropriate for ACS on the merits of Plaintiffs' claim.

### ii.    LaSalle

Plaintiffs have presented sufficient evidence to avoid summary judgment as to LaSalle. Unlike ACS, Plaintiffs can point to conduct on LaSalle's part that could constitute "intentional procurement" of DSI's breach of the PCA. LaSalle refused a direct request from DSI for $1.5 million to fund the severance pay. This could reasonably be found to have caused DSI to breach the PCA, because it did, in effect, leave DSI with no choice but to not pay the severance pay. See RESTATEMENT § 766 cmt. h. And while it is doubtful that LaSalle desired to cause DSI to breach the PCA, there is a genuine issue of material fact as to whether LaSalle knew the breach was "certain or substantially certain to occur as a result of" the decision to not fund the severance pay. Id. cmt.

26

j.  There is thus a genuine issue of material fact as to whether LaSalle intentionally procured a breach of the PCA.  LaSalle argues that "It is black-letter law that a party may refuse to deal with another and not be liable for tortious interference with contract."  (LaSalle Reply p. 10, R. at 100.) However, this argument goes more to the justification prong of the Kenty test, which the Court will now address.

"Only *improper* interference with a contract is actionable. . . . [E]ven if an actor's interference with another's contract causes damages to be suffered, that interference does not constitute a tort if the interference is justified."  Fred Siegel, 85 Ohio St. 3d at 176 (emphasis added). Plaintiffs argue that LaSalle's decision to not fund the severance pay was unjustified improper interference because LaSalle had previously agreed to fund the severance pay with the proceeds from the Omnova sale, and then broke that promise.  Plaintiffs rely on In re Knickerbocker, 827 F.2d 281 (8th Cir. 1987) as support for their argument that LaSalle's actions were not justified.  (Pl. Resp. p. 51-56, R. at 94.)

In Knickerbocker, the plaintiffs leased land that they used to operate a grain farming operation.  The plaintiffs had several outstanding debts related to their grain farming and other operations with defendant First National Bank of Oelwein ("FNBO"), as well as with First Bank Systems ("FBS") and the Commodity Credit Corporation ("CCC").  Id. at 284-85.  Plaintiffs defaulted on their loan to the CCC by blending damaged corn with better quality corn, and CCC called plaintiffs' loan.  This caused the grain elevator at which plaintiffs processed their corn, Aurora Supply ("Aurora"), to stop processing plaintiffs' corn, effectively cutting off plaintiffs' cash flow.  Id. at 285.  Plaintiffs, who were worried about the payments to their landlords under the lease contracts, met with FNBO, FBS, and Aurora and negotiated a deal under which Aurora would remit

payment from processing plaintiffs' corn to FNBO.  FNBO administered FBS' loan, and was subordinated to FBS.  Plaintiffs and Aurora testified at trial that FNBO agreed to provide Aurora with a hold-harmless agreement protecting Aurora from all claims from the landlords, FBS, and CCC that arose out of Aurora's sale of the plaintiffs' corn.  Plaintiffs also testified that FNBO and FBS agreed to apply the proceeds from the sale of the plaintiffs' corn to plaintiffs' lease contracts with the landlords, and then to apply the remainder to the FBS and CCC loans.  FNBO disputed both of these claims, arguing that Aurora only sought protection from the landlords, and that the proceeds from plaintiffs' corn were to be applied to the landlords and FBS equally and only when Aurora remitted payment sufficient to satisfy both the landlords and FBS.  Id.  Soon after, Aurora remitted to FNBO funds sufficient to pay the landlords but not FBS.  When FNBO did not provide Aurora with a hold-harmless letter protecting Aurora from FBS and CCC, Aurora refused to remit any more payment.  FNBO refused to apply the funds it had received from Aurora to the landlord debt without also paying off the FBS debt.  Id. at 286.  As a result, the landlords cancelled the plaintiffs' leases.

Plaintiffs sued FNBO for intentional interference with the lease contracts under Iowa law, on the theory that FNBO's failure to honor its purported agreement to pay the landlords first was an intentional interference with the lease contracts designed to push plaintiffs into liquidation.  Id. After a jury returned a verdict for plaintiffs, the trial judge granted a judgment notwithstanding the verdict on the ground that there was insufficient evidence to support plaintiffs' intentional interference claim.  Id. at 284.  The Eighth Circuit reversed the trial judge and affirmed the jury verdict.  Id. at 287.  The Eighth Circuit noted that, although the evidence concerning the agreement between plaintiffs, FNBO, FBS, and Aurora was conflicting, there was sufficient evidence to allow the jury to find that FNBO had in fact agreed to pay the landlords first and to provide Aurora with

28

a hold-harmless letter that covered not only the landlords, but also FBS and CCC. Thus, there was sufficient evidence to support the jury's verdict on the intentional interference claim. Id. at 288.

Plaintiffs analogize the instant case to the facts in Knickerbocker, and argue that LaSalle was not justified in refusing to advance funds for the severance pay because, just like FNBO in Knickerbocker, LaSalle agreed to pay the severance pay out of the proceeds from the Omnova sale and then broke that agreement. (Pl. Resp. p. 55-56, R. at 94.) In the opinion of the Court, considering the evidence and reasonable inferences therefrom, in the light most favorable to the Plaintiffs, there is a genuine issue of material fact as to whether LaSalle did in fact agree to fund the severance pay.

When Plaintiffs and DSI were negotiating the PCA, DSI was in serious debt to LaSalle, and had repeatedly defaulted on its financial obligations to LaSalle. Because of these defaults, LaSalle and DSI had entered into a series of forbearance agreements in early 2001, which obligated DSI to report its financial condition to LaSalle at regular intervals and to meet with LaSalle representatives to discuss DSI's business plan. (LaSalle Mot. Summ. J. p. 4, R. at 87.) LaSalle would have been keenly interested in any arrangement that would improve DSI's ability to repay its loans to LaSalle, and the Omnova Sale was negotiated for that purpose, as the proceeds would go to paying down DSI's debt to LaSalle. Plaintiffs, however, objected to the Omnova Sale, and requested an injunction to halt it. (Pl. Resp. p. 23, R. at 94.) This obviously threatened LaSalle's interest in proceeding with the Omnova Sale. The PCA, including the severance pay provision, was the vehicle through which Plaintiffs consented to the Omnova Sale and allowed it to proceed. And while LaSalle is correct that it never signed the PCA and the terms of the PCA do not reference LaSalle in any way, the circumstances surrounding DSI's relationship with LaSalle makes it unlikely that

29

DSI could have agreed to give the employees $1.5 million in severance pay without input and approval from LaSalle. DSI was not in a position to control its own finances (id. p. 24), and required LaSalle's approval for virtually all business decisions under the forbearance agreements. A reasonable jury could find that LaSalle approved the terms of the PCA in order to lift Plaintiffs' injunction and allow the Omnova Sale to proceed. This conclusion is buttressed by Sells' statement that, during the PCA negotiations, he saw O'Brien speaking on his cell phone to someone that Sells believed was a LaSalle representative. While the fact that O'Brien's phone records indicate that he did not call anyone from LaSalle during the PCA negotiations would certainly serve to impeach or undermine Sells' testimony, issues of witness credibility are for the factfinder to decide and are not properly resolved by the Court on summary judgment. This Court is not in a position to discredit Sells' testimony at this time, and there is a genuine issue of material fact as to whether LaSalle agreed to or approved the severance pay provisions in the PCA.

Because there is a genuine issue as to whether LaSalle approved the PCA, there is also a genuine issue of material fact as to whether LaSalle's decision to not fund the severance pay was justified. If a jury did find that LaSalle initially approved the PCA in order to remove the injunction blocking the Omnova Sale, Plaintiff's analogy to Knickerbocker is strengthened and a jury could reasonably find that LaSalle's later decision to refuse to fund DSI's request for the severance funds was not justified. Although LaSalle argues that it was entitled to protect its investment in DSI (LaSalle Mot. Summ. J. p. 19, R. at 87), the Fred Siegel justification test is a balancing test that must be evaluated under all the circumstances of the case. 85 Ohio St. 3d at 178-79. LaSalle's decision to apply the funds generated from the Omnova Sale to its own account and to deny DSI's request for money to fund the severance pay could, under the circumstances of this case, constitute improper

interference with Plaintiffs' contract with DSI.  It is for the factfinder to determine if LaSalle's decision to not fund the severance pay was proper or improper under all the circumstances, and summary judgment is not appropriate for LaSalle on Plaintiffs' claim.

**III.** **Conclusion**

For the above reasons, ACS' Motion for Summary Judgment (R. at 86) is **GRANTED**. LaSalle's Motion for Summary Judgment (R. at 87), however, is **DENIED**.

**IT IS SO ORDERED**.


Date: March 27, 2008                               **/s/ John D. Holschuh**
                                                   John D. Holschuh, Judge
                                                   United States District Court